Carr, J.
This is a bill by a vendor against the vendee, for.the specific execution of a contract for the sale of a tract of land. The county court decreed a performance : On appeal to the superiour court, the chancellor, without acting upon the decree, referred the title to a commissioner; upon whose report and other evidence taken in that court, the chancellor on a final hearing reversed the decree, as having been entered prematurely, and then decreed a specific execution.
Was the decree of the county court right? It is a principle laid down in many cases in equity, that an unwilling purchaser shall not be compelled to take a title with a cloud upon it; and that principle is assuredly strengthened here, where the party has contracted for a good and lawful right. What was the state of the title at the time of sale ? The tract consisted of 698 acres; to 489 acres of which, the vendor had an unquestioned title. To the residue, 209 acres, his title was of a different character: he held two thirds of it, by a deed from the executor of Owen Haskins, who had sold it under the will of his testator; and the other third, by a, purchase from Albert Haskins, a son of the testator, of his undivided third part, but for this part he had no conveyance. The validity of his title to the part purchased from the executor, depended on the question, whether the executor had power under the will to sell when he did ? *179 The words of the will are—“ It is my will and desire, that • 11,11, after my wijes death or marriage, my land shall be sold, and the money arising from the sale be equally divided among all my children.” The testator had in a former part of the will, directed that his estate should be kept together for the support of his wife and children. The wife renounced the will, but was neither dead, nor married ; and the children whose shares of the 209 acres the executor sold, were infants. It seems to me too clear for discussion, that the sale of the executor, under these circumstances, was not authorized by the will. Call it a naked power, or a power blended with a trust; construe it strictly or liberally; still you cannot make it a power to sell the land, while the wife was living and unmarried. The title, then, to these two thirds was clearly defective. The title to Albert's part was equally so : it was at best, nothing but an equity.
But it was insisted, that the vendee, at the time of his purchase, was well acquainted with the nature of the plaintiff’s title, and therefore is bound to take such as he can make. I do not consider the fact of his knowledge sufficiently established: he denies it in his answer; and we hear him calling for a sight of the will, when the deed was tendered to him. However, suppose him to have had this knowledge, I do not think it would oblige him to take a defective title, even on a sale at auction; it might induce the court to give the vendor time to perfect the title; but, surely, the court would not oblige him to take a defective title, in the teeth of his covenant, by which he stipulated to get, and the vendor bound himself to give, a good and sufficient right, at a short day.
It was contended, that admitting the title to the 209 acres, to be defective, there are still 489 acres, about the title of which there is no dispute, and that the court ought to have executed the contract thus far : and much evidence, pro and con, was taken, as to the importance of these 209 acres to the enjoyment of the tract of land purchased. There are *180 many cases that say, a trifling deficiency of a few acres in a tract of land, possessing no peculiar value in relation to the general tract, will not prevent the specific execution of a contract, as such deficiency lies in compensation (10 Ves. 306. 14 Ves. 413.) and this is interfering sufficiently with men’s contracts. I have never seen, and I hope never shall see, a case going so far as is asked here. A man buys a farm of a certain size for cultivation; you deprive him of nearly a third, and insist that he shall take the residue, as a substantial compliance with the contract. This would be truly to make contracts, and not to execute those already made.
At the time, then, of the hearing before the county court, I am clearly of opinion, that the plaintiff had not made out such a case as authorized a decree for specific execution. Ought that court to have dismissed his bill, or to have referred the title to a commissioner, and given further time for perfecting the title ? As to further time, no such thing was asked or thought of; no imperfection in his title was admitted by the plaintiff; on the contrary, he insisted by his bill, that ■ his title was perfect, and that the deed which he had tendered, and which he exhibited with his bill and made part of it, was a full compliance with his contract. This was the issue made up by the parties, and submitted to the court; and to try this, they went to hearing by consent. Further time then for improving the title, was wholly out of the question. Ought the court to have sent the case to a commissioner for his report upon the title, before it proceeded to decide upon it? I think clearly not. The whole depended upon a dry point of law, which the court had as directly before it upon the pleadings and the evidence, as it ever could have it. ' To have sent the case then to a commissioner would have been to incur a vain and useless expense and delay; and that, when neither party wished it, but both were anxious for an immediate decision of the case in its actual posture. Even in England, where their commissioners are men of learning and professional skill, a *181 reference would not have been ordered in such a case. This is clear from the cases cited at the bar, of Rose v. Calland and Omerod v. Hardman, where a reference was pressed and refused by the chancellor,—in the first case, saying, “ he should create a needless expense by it”—and by Chambre justice, and baron Graham, in the last case, (sitting in the duchy court of Lancaster,) upon the same ground. I conclude, then, that the county court, on the hearing, ought neither to have given further time, nor to have referred the title; but finding it essentially and materially defective, should have dismissed the bill.
It is equally clear to me, that on the appeal, the chancellor ought to have tried the case upon the record, as it stood before the court below, and to have reversed the decree and dismissed the bill; which having failed to do, I think we should now reverse his decree and dismiss the bill.
Cabell, J. concurred.
Brooke, J.
The plaintiff put his claim to a specific execution of the contract, on two grounds; I. on the validity of his title to the 209 acres purchased of the executor of Haskins and of Albert Haskins, his title to the 489 acres not being questioned; and 2. on the defendant’s knowledge of the defect of the title to the 209 acres, supposing it to be defective.
I think there was nothing in the allegation that the defendant was apprised of the defect in the title, if any, at the time he entered into the contract. It is probable enough, that both parties believed that the title to the 209 acres of land was a good title, when the contract was entered into: yet the plaintiff stipulated to make the defendant a good and lawful right to the land : and the defendant’s knowledge of its defects could not affect him, since he did not rely on that knowledge when he made the contract. Stockton v. Cook, 3 Munf. 68. If Jackson was asking for a specific execu *182 tion of the contract, the case would be different: proof that he knew of the state of the title when he made the contract, would compel him to take the title, as he understood it at the time; or the court would dismiss his bill; it would not execute the contract in the terms of it. But he is here asking nothing of the court, and insisting on his legal rights under the contract; and there is nothing in his conduct to 'affect his conscience. If he had purchased the land at the sale made by Haskins’s executor, at which he was a bidder, and had relied on,his understanding of the title, and that alone, on a bill for specific execution, he would be compelled to take the title, as it was represented to him by the auctioneer; that is, the title he bargained for. But, in the case before us, however confident he may have been, when he made the contract, that the title was a good one, he was not bound to make an adventuring contract on his knowledge of the title; and he did not do so; on the contrary, he took a contract binding the vendor to make him a good and lawful title.
In this view of the case, there was nothing before the county court, to justify a reference of the title to a commissioner. Its validity depended on a just construction of the will of Owen Haskins, and the authority of his executor to sell the land under it. It was a dry question of law, for the decision of which the report of a commissioner could furnish nothing, and which the court alone was competent to decide.
That the county court erred in its decision is very clear. The sale by the executor was certainly premature. There are cases, in which the power of a trustee to sell, may be executed before the expiration of the time prescribed by the instrument giving the power; as in the case of Uvedale v. Uvedale, where the widow claimed as a creditor. But, in the case before us, the sale cannot be justified by the authority of that case, or any other. The renunciation of the will by the widow, was a release of her interest in the execution of the power, but was not equivalent to her mar *183 riage or death (the events, on the happening of either of which, the executor was authorized to sell) either in the intention of the testator, or as regarded the interests of the parties, under the power. Some of them were infants; and they entitled to unequal interests in the subject, until one of the events prescribed by the will should happen. The intention of the testator was, in either of those events, the marriage or the death of the widow, the whole, and not a part, of the subject should be sold. The power to sell the whole and divide the money among the children, was a trust, which was not properly executed by selling a part after dower was assigned to the widow. The county court erred, then, in deciding that the title was a good and lawful title. There is nothing in the case to justify its decree, on the ground of a waiver by Jackson, of his title according to the terms of his contract. There is no proof, that, at the time he took possession of the land, he agreed to take any but a good and lawful title according to his written contract. His abandonment of it, in a few weeks after he discovered that the vendor could not make him a title until infants should come of age, nor then, if others also, in whom the title was in part, should dissent and elect to take the land, was evidence to the contrary.
Neither is this a case for compensation. It would be to make a contract for him, to compel him to take the 489 acres only, at a value not put on it by himself; for he has valued it in connexion with the 209 acres, and not by itself. As to time not being of the essence of the contract, unless expressly made so (which it is not in this case); time, nevertheless, may be very material to the justice of the case. Jackson was to pay for the land by instalments, and might reasonably calculate on the profits to assist him in the payments. To continue in possession under a doubtful title (at least) might be ruinous to him: he might pay the instalments, and put improvements on the land, or its value might be enhanced by other causes, and then he might lose all.
*184 It is the settled rule of this court, not to compel avendee to pay the purchase money until he gets a title. In the state of the case before the county court, the bill ought to have been dismissed. And when the cause came into the court of chancery by appeal, that court ought to have reversed the decree of the county court, and to have rendered such decree as the county court ought to have rendered; there being no ground on which to retain the cause in that court, laid in the proceedings of the county court. Both decrees ought therefore to be reversed, and the bill dismissed.
Tucker, P.
In examining this case, I shall begin with the inquiry, what decree the court of chancery ought to have pronounced upon hearing the appeal from the decree of the county court ? The practice in such cases is perfectly familiar to the profession. Where the appellate court is of opinion, that the inferiour court has erred, it proceeds not only to reverse its decree, but to make such decree as the court below ought to have made. Thus, its reversal may be absolute and in omnibus, not only annulling what has been done in favour of one party, but entering an absolute decree in favour of the other; or it may be partial and interlocutory, when the court below has proceeded prematurely to adjudicate finally between the parties, without such preliminary inquiries, as appear, upon the face of the record, to have been essential to enable the court to pronounce upon the rights of the parties, with a full understanding of the case. Thus, in the present instance: if the county court ought to have decided, that there was no ground for specific performance, the decree should have been wholly reversed, and the bill dismissed with costs: for this the appellant’s counsel contend. But, if there was enough in the record to shew that, instead of decreeing specific performance, on the one hand, or dismissing the bill on the other, the court should have directed a reference of the title to a commissioner, before it proceeded to pronounce definitively between *185 the parties, then the court of chancery ought to have reversed the decree, and to have proceeded to direct that reference, which ought to have been directed by the inferiour tribunal. Nor do I think the irregularity of omitting to affirm or reverse the decree, definitively, when the appeal was first heard, is material, provided the chancellor did not, in his subsequent decision, bring matters, introduced into the cause esc post facto, to bear upon the antecedent question of error or no error in the county court. This, indeed, would be altogether erroneous; for, except in a few cases, founded on the practice of the spiritual courts, and some others resting on particular statutory provisions, it is a practice unknown to our law, for a superiour court, when reviewing the sentence of an inferiour, to examine the justice of the former decree, by evidence which was never produced below. We must, therefore, consider the decree of the county court, upon the proofs in the cause at the hearing there.
In that state of the cause, ought the county court to have pronounced the decree it did ? If not, ought it to have dismissed the bill? or directed a reference of the title to a commissioner ? That the decree of the county court was not justified by the proofs in the cause, was admitted by the chancellor. But I go further than he has done, being of opinion, that nothing appeared before the court to justify even a reference of the title, and that the bill of the plaintiff should therefore have been dismissed. This brings us to an examination of the merits of the controversy.
By the contract between the parties, Ligón contracted to give Jackson possession on the 25th December 1822, and to make him a good and lawful right, on or before the 1 st January following. It was not a mere engagement to seal and deliver a conveyance, with the usual covenants of title, which Jackson regarded; the vendor bound himself to make a good and lawful right, and this, by the terms of the contract, was to be accomplished by the 1st January. Whether Jackson knew, or did not know, at the time of the *186 contract, that the title was defective, is wholly immaterial: if he did n'ot know it, he surely o,ught not to be compelled 'to take a defective title that was concealed from him, and which he could not have intended to receive: if he did know it, he provided against it expressly, by the covenant that required a good and lawful right to be made by a given day; and if, in the present case, the purchaser would be concluded from objections to the title, by the fact of his prior knowledge of its defects, it is not perceived what course a buyer is to take who desires to secure himself ,against known defects. The case of Stockton v. Cook, 3 Munf. 68. very clearly shews the understanding of this court, that a covenant against incumbrances, comprehends known as well as unknown incumbrances, and that the vendee is not precluded by his previous knowledge, from claiming the fulfilment of the covenant. Were it otherwise, it would be impossible for him to provide for his security.
The contract, then,.having bound the vendor to make a good and lawful right, not with reference, as he supposes, to Jackson’s notions of a good title, but with reference to the .well established principles of the law, the next question is, whether a rigorous compliance with this engagement on the appointed day, was essential to Ligorfs right to specific' execution ? This brings us to the subject of time being of the essence of the contract.
At law, in every case of dependent covenants, time is of the essence of the contract, since the plaintiff cannot recover without shewing performance on his part, or readiness and ability to perform. But, in equity, it is, upon general principles, otherwise. It is the boast of that court, that it ■looks at the substance of things, and is regardless of forms; that it relieves against penalties and forfeitures incommensurate to the injury which the party has done, and where ample compensation can be made will compel his adversary to accept such compensation. On like principles, although a vendor may not have complied in strictness with his contract to convey,—or the vendee may not have paid his mo *187 ney precisely at the stipulated time, equity will, nevertheless, upon a proper case made, enforce the contract, instead of permitting either party to insist on an arbitrary forfeiture of its benefits. Out of the exercise of this jurisdiction has grown the idea, that, in equity, time is not regarded as of the essence of a contract, and a false report of an opinion of lord Hardwicke, in Gibson v. Patterson, 1 Atk. 12. carries it to an extent in no wise justified by reason or later authorities. That parties may, if they please, make time of the essence of their contract, is now clearly admitted, and seems to follow from the unquestioned right of parties to frame their contracts at pleasure, unless, indeed, it can be shewn that this stipulation is against moral right, or positive law. It would seem, then, that the intention of the parties is, in this, as in other cases, to be looked to •, and where it is plain that, in default of a strict performance on one part, it was the intention that the contract should cease to be binding on the other, that intention must be carried into effect: for courts do not sit to overthrow the agreements of parties, but to carry them into effect, where they are legal, equitable, and reasonable.
It cannot be denied, however, that the mere appointment of a day for the payment of money, or delivery of a title, has not been regarded as a sufficient indication that time is of the essence of the contract. Seton v. Slade, 7 Ves. 273-5. And, in the case at bar, there appears to me nothing to shew, that the parties so designed it here. There is, indeed, a strong provision to prove the contrary; the provision, namely, that Jackson might proceed to prepare for a crop, and should have possession on the 25th December, only seven days before the day fixed for making a title. On that day, he accordingly took possession, and actually went on the land to reside. Now, if time was of the essence of the contract, the first of January must have decided that it was either good or void ; and, in that view, it is scarcely to be conceived, that Jackson would have contracted for the possession on the 25th December, with the risque of being *188 obliged to relinquish it on the 1st January for want of title, instead of fixing the day of possession to the 1st January, only seven days later, when all suspense would have necessarily terminated.
But though time may not have been of the essence of the contract, yet it may have been rendered by the conduct of the vendor or vendee, subsequent to the contract, of the essence of the transaction between the parties. Such, I conceive, has been the case here. Jackson, I have little doubt, supposed that the title from Haskins the executor, and perhaps, that from Albert Haskins, would be good. But when he had, as I suppose, taken counsel of his friend, or of his lawyer, and found that the will conferred no authority on the executor, to sell during Mrs. Haskins’s life and widowhood, he distinctly announced his objection to Ligón, refused to receive the title, and, in a few weeks, renounced the possession. It is said, indeed, that the time of his quitting the premises does" not • appear; that it might have been months, or a year. But I think we cannot infer that Ligón’s own witness would have used the terms weeks, if the continuance of possession had been for months; nor, indeed, does any man, even in common parlance, ordinarily use the lesser denomination where the use of the greater is appropriate to the fact. I take it, then, that the possession was relinquished within.a month; the rejection of the title was distinctly announced, and Jackson returned to his own home. In this, I think, he was fully justified, if he had good reason to be dissatisfied with the title. To have continued the possession would have been to close the door upon his objections. Moreover, if his objection to the title was a valid one, (the want of power in the executor to sell) it was most formidable, since it would have required years, and a fortuitous occurrence of events, ever to make it good. Whether, therefore, time was or was not of the essence of this contract, I think the vendee was justified at this early stage of the transaction, in this prompt, and (as far as we can see) this bona fide rejection of the title, and of the *189 purchase. He has not, in the language of the books, “ turned round the contract upon frivolous objections.” He has renounced it upon vital and well founded objections, which it would have required years to remove, if indeed they were ever susceptible of removal. After this measure, Ligón is not heard of until the commencement of the suit, just twelve months after the renunciation of the contract by Jackson: he gives no notice to Jackson, that he shall attempt the completion of the title, or the enforcement of the contract; nor does he sue for that purpose until twelve months have elapsed. Neither has he proved, that he also abandoned the property, which, if true, would have been a fact of some importance in estimating his conduct in this affair. The case is thus brought, I think, strongly within the influence of that of Lloyd v. Collett, 4 Bro. C. C. 469. 4. Ves. 689. See also 4 Johns. Ch. Rep. 559. It is not reasonable, that a purchaser, who in proper time has prged his objections to a title, and who on discovering that a good title cannot be made, has at once refused to perform the agreement, should be compelled to abide by it.
In this view of the transaction, it will be perceived, I have assumed as a postulate, that the title in this case was clearly defective, and that there was no reasonable calculation that it could be rendered otherwise. It is, therefore, proper that this question should in its turn be examined, though very cursorily.
The better opinion, upon the authorities cited at the bar, seems to me to be, that a power given to an executor to sell after the determination of a life, cannot be executed during that life. The sacrifice inevitably attendant upon the sales of reversionary interests, renders such a measure always hazardous; and, therefore, it is not fair to presume, where such a power is not given by the testator, that he could have designed it should be exercised by his executor. In this case, however, the widow by renunciation of the will has relieved two thirds of the estate from the incumbrance of her life, and has thus enabled the executor to *190 proceed to a sale, which would not be liable to the objec- . , . . . tions, applying to the sales of reversionary interests. But, while one difficulty is removed, another is substituted of a not less formidable character.- The testator directed the whole tract to be sold after his wife’s death or marriage. His wife has claimed her dower; that has been laid off to her. If, as usual, it comprehends the dwelling house, and curtilage, and other improvements on the land, then it is impossible to say, that either the sale already made by the executor has not been injured by this partition, or that the sale of the dower land, after the widow’s death, will not be so affected. It is not only very possible, but highly probable, that the sale of either without the other, would be prejudicial to both; and this is a matter which the heirs of Haskins, at a remote period, might have thought proper to litigate with Ligón, or with Jackson, if he had been the purchaser. It is impossible, I think, (to use the language of the books) that this court should compel Jackson to buy a law suit. Whether the legal title was in the executor or not, whether there was a trust, or an imperative duty or a mere power, the act of the executor in selling under such questionable circumstances, and in selling, moreover, -the shares of two out of four heirs, when each had a right that the intirety should be sold for the joint benefit,—was liable to a rigourous scrutiny by the heirs, when they should attain to full age. When this would have been, does not distinctly appear in the record; but, as there were several under age at the time of the contract, it is certain that several years, must have intervened, before the youngest would attain his full age, so as to ratify the act of the executor, and to quiet the title of the vendee. Could it be expected, that Jack-son was to be held in suspense during this interval; and encounter, when it was determined, the sheer chance of the children ratifying the transaction ? But this is not all. Those children might die before they attained their majority. Their interests might have devolved upon numerous heirs scattered over the country, some perhaps femes covert, and *191 others infants of more tender years than themselves, whose acquiescence in the premature exercise of his power by the executor, would be the less easily acquired, in the disadvantageous situation in which he vras placed. Thus circumstanced, I do not think Jackson was bound to accept a title so defective, and which could„ not be rendered good for several years, and might never be rendered good. He was not bound to speculate on the possibility of Ligon’s being able to buy out or quiet the claims of the heirs. He was not bound to take an estate, which he must either suffer to remain unimproved, till the cloud had passed which hung over the title, or which he must improve at imminent hazard. He was not bound to take an estate without a marketable title, since without such title he might be subjected to the heaviest loss. Had he taken it, and found it necessary to sell, the doubt about the title would have rendered it a dead property on his hands; and (as this very decree shews) it might be forced by Ligón himself into the market for sale, with a cloud hanging over it, arising out of his own failure to fulfil his express engagement to make a good and lawful title.
It may be said, indeed, that it was impossible for Ligón to obtain the title. Be it so. Then what is the consequence ? The answer is plain. As he cannot do what he undertook to do, as he cannot perform his contract, he ought not to expect Jackson to abide by it. He ought to be well satisfied, that there are no worse consequences, from his having contracted to do, what he now finds he cannot do. I have no doubt, that he contracted in good faith; that he supposed the executor’s conveyance and Jllberfs contract were sufficient- and so, very possibly, did Jackson. But the latter did not choose to rest upon this opinion: he bound his vendor to make him, by a given day, a good and lawful right; and that vendor, too confident in his title, undertook accordingly. When he found he could not perform, and that Jackson promptly renounced the contract, he ought not to have hesitated to abandon his pretension to enforce it.
*192 In the view which I have taken of the title under the ex-_ , , ecutor, I have not thought it necessary to scrutinize narrowly, the character or extent of his power; since, under any aspect, a purchaser under him must inevitably be exposed to the hazard of loss and litigation. It is, however, my opinion, that the executor in this case had but a bare power; that there is nothing from whence a technical trust can be inferred; and that the legal title descended to the heirs, subject indeed to the provision made for their support during the life and widowhood of the wife, and subject further to be divested by a due execution of the power after her death or marriage. If this be so, then thp legal title was not conveyed by the premature exercise of his power by the executor, and all that his deed could pass was a questionable equity; which no purchaser is bound to take.
It is not necessary to point out the other defects of this title, at the time of the decree rendered by the county court. The invalidity of the conveyance of the executor, is itself sufficient to vacate the contract, unless it could be shewn that the vendee, even without this land, would get what he substantially contracted for. Of this, no evidence was before the county court; nor is it reasonably to be inferred, when we find that Jackson himself was a bidder for this very property at the executor’s sale; that Ligón purchased it and sold it as an appendage to his own land, and that, to say the least, others besides Jackson deem the Haskins tract an important appendage to the Ligón tract. Besides this, there is no such allegation in the pleadings, but they stand solely upon the question, whether there has or has not been a compliance with the contract on the part of Ligón.
Upon the whole, I think it clear, that at the time of the decree in the county court, Ligón had not complied, and could not comply, with his contract; and, of course, the bill ought to have been dismissed, unless that court ought either to have referred the title to a commissioner, or have given further time for the completion of the title. Neither of these things, in my opinion, ought to have been done.
*193 As to reference of title : This practice, now so well set-tied in England, has not, I believe, prevailed very generally with us. The reason for having a report, is said to be, that the ground upon which the court proceeds, may appear upon the record. And, in England, where titles are complicated by mortgages, terms, family settlements, and outstanding trusts, it is of great importance as well as convenience, that such references should be made. The necessity can more rarely exist with us, where the title is generally more simple and the question of its validity is fairly presented by a few title papers of the simplest form. For, as the commissioner’s opinion upon the validity of the title, is liable to exception, and to the revision of the court, it is obvious, that where the question of title is already fairly presented, and a distinct point is offered to the court for its consideration, a reference would only lead to embarrassment and expense, without subserving any beneficial end. The english practice will be found, indeed, I think, to coincide with this principle.
There, when a vendor files a bill for a specific performance, stating that he was unable to complete his title at the time fixed, but that he is now ready to do so, if he makes such a case as entitles him to relief in case he can make a good title, the court will refer the title to a master for his report. And, even when the vendor states that he is yet unable, but shews that he will soon be able, to perfect the title, the court, upon a proper case made, will direct the master to report whether a good title can be made at the time of the report, and if so, or if it can even be made at the date of the decree, it may suffice. In these cases, it must be observed, a single naked question is not often presented to the court, but the general question of the validity of the title proposed to be made; and, therefore, a reference is directed, in order that the necessary abstracts and information may be laid before the court, and the points of dispute fairly and distinctly pointed out, either by the report, or by exceptions which may be filed to it. So, if the de *194 fendant in answer to the allegation that the plaintiff can now make a good title, asks for a reference, by his answer or by motion, he is peculiarly entitled to it, as the plaintiff is aslting relief beyond the law. 6 Ves. 646.
But, I think, there is no invariable rule, even in England, that the court ought never to decide upon the validity of the title, but should send the title to a master. This is established by the cases of Rose v. Calland, and Omerod v. Hardman. The latter is peculiarly strong and appropriate. (By the way, the remarks of the judges, upon the merits of the case, have a strong bearing upon this case). The bill was filed in the court of chancery of the county palatine of Lancaster, for specific performance, by a purchaser. The defendant by his answer took a variety of objections to the plaintiff’s ability to make a good title; all of which, however, grew out of the instrument under which the plaintiff assumed the power to sell the premises. • The vice chancellor dismissed the bill, without referring the title. In the argument, this omission is made the substantive objection to the decree of dismission, although the counsel admitted, that if it had incontestibly appeared, that a good title could not have been made, the decree would have been right. Chambre, J. said, “ against this decree it is said, that there is an" invariable rule that the court ought not to decide upon the validity of the title, in the first instance, but that the title ought to be sent to the master, and should be taken into consideration by the court upon his report. If there was an inflexible rule of that sort, it would dispose of the case. But if no authority had been cited, I should find it very difficult to accede to that idea, that there should be such inflexible rule: for if it should clearly appear to the court, upon the pleadings and the evidence, that there are objections not to be removed, it would be an idle and unnecessary expense to the parties, to answer no purpose, to make such a reference. We are, however, relieved from any difficulty from the circumstance of a very recent and decided authority by the lord chancellor,” (meaning Rose v. Calland) *195 Baron Graham coincided in this opinion : “ What” (he em- . phatically asks) “ is the effect of sending the case to a master, when we see the title can only be good, if the heir and other persons join ?” And these opinions seem to be strongly sustained by the lord chancellor, in the case of Jenkins v. Hiles, which was cited for the appellee : he there distinctly intimates, that it is not the practice of the courts to refer the title to a master, where the answer of the defendant offers, “ for the decision of the court, one neat dry point upon which his objection rests.” Speaking, moreover, of the case of Omerod v. Hardman, he appears to approve the principle laid down by the judges as to this doctrine of reference, though (if I understand him rightly) he had some doubt of the propriety of its application to that case. He considers the cases of Rose v. Calland, and Omerod v. Hardman, as not within the ordinary rules requiring a reference, being cases where the vendor comes for specific performance, and the vendee calls for a decision upon the title offered by the vendor, who, instead of shewing by his bill that he can heal defects, puts himself upon the title he has offered, and chooses to abide by that. He says, that admitting the vendor’s right, under the general rule, to clear away difficulties between the hearing and the report, “ it would be difficult to say, that there could be no case, in which the plaintiff might not have stated himself so conclusively, that the court should hesitate in the first instance to decide. If I am to state a doubt upon the case in the duchy court, it would be a doubt, whether it could be collected from what was stated by the plaintiff, that, if the title was imperfect, it was stated conclusively, or whether, if stated conclusively, it was doubtful.”
From this view of the cases, I am clearly of opinion, that a reference to a commissioner by the county court, was neither necessary nor proper, as this case appeared in that court; and a fortiori, it could not have been proper to give time to the plaintiff, from month to month, or from year to year, to see whether he could buy out or extinguish the outstanding rights to this property. It is going far enough *196 to give time, as is sometimes the effect of a reference, to enable the party to get in the title, where he has already a right to the estate, and where the vendee is in possession, as was the case in Beverley v. Lawson, a fact I conceive of the utmost importance in these cases. But, I doubt whether any case can be made, in which it would be proper to give a plaintiff, who seeks a specific performance against a defendant, who has promptly rejected the title as defective, and thrown up the possession, an indefinite time to see, whether he can purchase up the rights of others in the estate, in order to enable him to comply with his engagements after the lapse of years. Such, in effect, 1 conceive this case to have been.
Both decrees reversed, and bill dismissed.